1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11   HERBERT FLORES-TORRES,

12                Petitioner,                    No. C 08-01037 WHA
                                                 No. C 09-03569 WHA
13        v.

14   ERIC H. HOLDER, JR., United States Attorney   **FINDINGS OF FACT AND**
     General, JANET NAPOLITANO, Secretary of       **CONCLUSIONS OF LAW**
15   the Department of Homeland Security, NANCY     **AFTER BENCH TRIAL**
     ALCANTAR, Immigration and Customs
16   Enforcement Detention and Removal Operations
     Field Office Director, and EDWARD FLORES,
17   Chief of Corrections of Santa Clara County Jail,

18                Respondents.

19   ─────────────────────────────────────/

20                            **INTRODUCTION**

21        Pursuant to 8 U.S.C. 1252(b)(A), this matter was transferred here by the court of appeals

22   for a determination of petitioner Herbert Flores-Torres' claim that he is a United States citizen.

23   He is currently detained by Immigration and Customs Enforcement pursuant to a temporary stay

24   of removal pending resolution of his claims by the Ninth Circuit.  After a bench trial, this order

25   now determines that petitioner became and remains a United States citizen pursuant to former 8

26   U.S.C. 1432(a) upon the naturalization of his mother on September 15, 1995.

27                         **PROCEDURAL HISTORY**

28        In June 2005, petitioner was convicted of being a felon in possession of a firearm in

     violation of California Penal Code § 12021(a)(1).  In October 2006, while petitioner was

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   incarcerated for this offense, ICE filed an immigration detainer and placed him in removal

2   proceedings, charging him with being an alien convicted of an aggravated felony.  8 U.S.C.

3   1227(a)(2)(A)(iii).  Petitioner has been in ICE custody ever since.

4        Petitioner filed a motion in immigration court to terminate the removal proceedings

5   against him on the grounds that he was a United States citizen.  While removal proceedings

6   were pending in immigration court, petitioner filed a federal petition for a writ of habeas corpus

7   to challenge his detention.  He argued that because he raised a "non-frivolous" or "substantive"

8   claim to United States citizenship, ICE had no authority to detain him pending the conclusion of

9   judicial proceedings regarding his citizenship claim.  A May 2008 order by the undersigned

10  denied the habeas petition.  It held that review of petitioner's citizenship claim was available

11  only via a final order of removal and that the district court lacked subject-matter jurisdiction

12  because the REAL ID Act of 2005 granted federal appellate courts exclusive jurisdiction to

13  review final orders of removal.  8 U.S.C. 1252(b)(5)(A).

14       The Ninth Circuit, however, held that district courts indeed have jurisdiction to review a

15  habeas petition where it challenges detention pending resolution of removal proceedings.  It

16  remanded the habeas petition to address petitioner's claim that his detention during the

17  pendency of his removal proceedings was unlawful due to his claim to citizenship.

18       In the meantime, the immigration courts forged ahead.  During the pendency of the

19  federal habeas appeal, the immigration judge ruled that petitioner was *not* a United States

20  citizen and ordered his removal to El Salvador.  Just days after the Ninth Circuit issued its order

21  remanding the habeas action to this Court, the Board of Immigration Appeals affirmed the

22  immigration court's decision.  Petitioner then appealed the order of removal to the court of

23  appeals.  The Ninth Circuit determined that there were material issues of fact pertaining to

24  whether petitioner was a United States citizen.  It stayed its consideration of petitioner's appeal

25  and transferred the issue of petitioner's citizenship to the undersigned pursuant to 8 U.S.C.

26  1252(b)(5)(B) for a hearing and decision on petitioner's nationality claim.  Section

27  1252(b)(5)(B) states that petitioner's nationality claim should be decided as if it had been

28  brought directly as a request for a declaratory judgment under Section 2201 of Title 28.

United States District Court

For the Northern District of California

1    Upon the transfer, both petitioner's habeas action and citizenship claim proceedings

2    were pending before this Court.  On October 1, 2009, an order held that habeas jurisdiction had

3    evaporated when a final order of removal had been issued by the BIA (subsequent to the Ninth

4    Circuit's remand).  The declaratory proceeding on petitioner's citizenship claim then proceeded

5    to trial on November 16, 2009.  Both sides did an excellent job in presenting their cases and the

6    Court thanks all advocates for their assistance.

7                                              **FINDINGS OF FACT**

8    Although voluminous proposed findings were submitted and considered, this order has

9    found its own way and made its own findings rather than picking and choosing between the

10   competing versions.  That a proposed finding has not been expressly incorporated does not

11   necessarily mean it has been rejected; rather, it means that this order has found it unnecessary to

12   adopt or reject it per se.  To the extent, however, that any proposed finding was expressly

13   admitted by the responding party in the most recent round of proposals and responses, this order

14   hereby adopts the proposal (to the extent expressly admitted).  It is unnecessary for this order to

15   cite the record and it will not do so except as to particulars that may assist the court of appeals.

16                                     *          *          *

17   Petitioner was born on April 21, 1978, in Aguilares, El Salvador.  He is a Salvadoran

18   citizen.  His mother is Rosa Estela Torres, and his natural father is Juan Bautista Flores.  His

19   biological parents were dating when petitioner's mother became pregnant but petitioner's father

20   ended their relationship after learning that she was pregnant.  Petitioner was subsequently born

21   out of wedlock.  His parents never married or attempted to marry each other.

22   In 1978, the civil code of El Salvador distinguished among (i) "legitimate children" who

23   were born in wedlock, (ii) "natural children" who were born out of wedlock but whose paternity

24   was acknowledged by their fathers and (iii) "illegitimate children" who were born out of

25   wedlock and whose paternity was not acknowledged by their fathers.  Prior to 1983, an

26   illegitimate or natural child could be legitimated only if his parents entered into a lawful

27   marriage after his birth.

28

United States District Court
For the Northern District of California

Article 280 of the civil code of El Salvador described several methods by which the father could acknowledge paternity of a child born out of wedlock for purposes of distinguishing a natural child from an illegitimate child. One of those methods was for the father to submit to the Salvadoran civil registry the information from the child's birth certificate and a signed certification acknowledging his paternity and stating that he was known to the director of the civil registry. On May 3, 1978, when petitioner was twelve days old, petitioner's father acknowledged his paternity of petitioner in this way (TX 304, 307). Petitioner was accordingly deemed a "natural child" under Salvadoran law.

Prior to 1983, the Salvadoran civil code gave custody of a natural child to the mother. The father of a natural child only gained custodial rights if the mother was absent or incapacitated.

During petitioner's childhood in El Salvador, he lived with his mother and his maternal grandmother. He never lived in the same household as his father and never stayed overnight at his father's home in El Salvador. When petitioner was a child in El Salvador, his father did not provide any financial support for him. Petitioner's father never sought custody of petitioner. During petitioner's childhood in El Salvador, his father only visited him on one occasion when petitioner was eight days old. They had no other contact.

In January 1981, petitioner's mother moved from El Salvador to the United States and left petitioner in the care of his maternal grandmother. Petitioner's mother began living in Los Angeles shortly after arriving in the United States and has lived there ever since. Petitioner lived with his maternal grandmother in El Salvador until January 1986, when he joined his mother in Los Angeles. Between January 1981 and January 1986, she sent money to her mother to pay for petitioner's care and maintained contact with petitioner through telephone calls and letters. Again, petitioner's father had no contact with petitioner and did not provide any financial support for him during this period.

In December 1983, El Salvador adopted a new constitution. Article 36 of the 1983 constitution stated, "Children that are born within a marriage or outside of it, as well as adopted children, have equal rights before their parents. It is their duty to provide protection, assistance,

4

United States District Court

For the Northern District of California

1    education and safety to their children" (TX 104-1).  This arguably repealed the discriminatory

2    distinction between legitimate and illegitimate children in El Salvador, although the new

3    constitution did not use the word "legitimation" and did not explicitly provide that all children

4    born out of wedlock would be legitimated, much less expressly apply that concept retroactively

5    to children born prior to its adoption.  Article 249 of the new constitution stated that any old

6    secondary laws that conflicted with precepts of the new constitution were repealed.  Article 271

7    required the Salvadoran legislative assembly to harmonize the new constitution and the

8    secondary laws of El Salvador within one year.

9         The Salvadoran legislative assembly failed as required to harmonize within one year the

10   new constitution with the older secondary family laws that made distinctions between legitimate

11   and illegitimate children.  A new, harmonized Salvadoran family code was not enacted until

12   1993 and did not become effective until April 1, 1994, a few months before petitioner's mother

13   was naturalized and many years after she and petitioner had moved to the United States.

14        The Salvadoran family code of 1994 made no distinction between legitimate and

15   illegitimate children.  The family code referred to the powers and duties granted and imposed

16   on parents vis-a-vis their children — including custodial powers and duties — as "parental

17   authority."  It assigned parental authority to both parents jointly *or to either one of them in the*

18   *absence of the other*.  It stated that both fathers and mothers had a duty to care for their children

19   but that in the event that the parents did not live together they could agree between themselves

20   which of them would have the duty of personal care of their children.  In the event that they

21   could not agree, a judge would decide which of the parents should have custody based on the

22   best interests of the children.  A judge also had the power to order the loss of parental authority

23   by judicial decree in the event, among others, that a parent abandoned a child without just

24   cause.

25        By then petitioner had left El Salvador.  Petitioner had moved to Los Angeles to live

26   with his mother in January 1986 and has lived continuously in the United States since then.  By

27   then his father had also moved to the United States and was living in San Antonio (by the time

28

5

United States District Court

For the Northern District of California

1    that petitioner was in eighth grade).  So the 1994 change in Salvadoran law is mainly of

2    theoretical interest.

3        When he was in middle school in Los Angeles, petitioner had problems in school with

4    gang members.  His mother sent him to stay with his father in San Antonio during his second

5    semester of eighth grade.  While he was staying with his father, his mother sent him money to

6    pay for his expenses.  His father did not introduce him to anyone including his wife and

7    daughters as his son.  His father treated him "like a stranger" and made him sleep in the laundry

8    room.  After he finished that semester of school, petitioner returned to California to live with his

9    mother.  He did not stay with his father again.

10       Petitioner became a lawful permanent resident of the United States on November 6,

11   1993.  On September 15, 1995, his mother became a United States citizen by naturalization.  By

12   operation of former 8 U.S.C. 1432(a), her minor children whose paternity was not

13   acknowledged by legitimation automatically became United States citizens at the same time.

14   On that date, petitioner was 17 years old and was still a minor.

15       Before September 15, 1995, petitioner's father never provided any financial support or

16   paid any child support to petitioner.  On October 21, 1995, petitioner's mother served his father

17   with a child support complaint and was thereafter awarded child support on March 29, 1996.

18   Very little was ever paid, however.

19                           **ANALYSIS AND CONCLUSIONS OF LAW**

20       On September 15, 1995, Immigration and Nationality Act Section 321(a) of the

21   Immigration and Nationality Act of 1952, former 8 U.S.C. 1432(a), stated in its entirety:

22           (a)     A child born outside of the United States of alien parents,
             or of an alien parent and a citizen parent who has subsequently
23           lost citizenship of the United States, becomes a citizen of the
             United States upon fulfillment of the following conditions:
24
             (1)     The naturalization of both parents; or
25
             (2)     The naturalization of the surviving parent if
26           one of the parents is deceased; or

27           (3)     The naturalization of the parent having
             legal custody of the child when there has
28           been a legal separation of the parents or the
             naturalization of the mother if the child was

6

United States District Court

For the Northern District of California

born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4)     Such naturalization takes place while such child is under the age of eighteen years; and

(5)     Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

Section 321 was repealed in 2000, but the parties agree that its later repeal has no bearing on the issue of whether petitioner automatically derived citizenship pursuant to its requirements on September 15, 1995, when it was still in effect.  It is undisputed that on September 15, 1995, petitioner met most of the requirements for derivative citizenship as a child born out of wedlock under Section 321(a)(3).  The only dispute is whether petitioner's "paternity had been established by legitimation" at the time of his mother's naturalization.  This depends on what it means to "establish paternity by legitimation" for purposes of the Act. Because this phrase is not explicitly defined by the statute, this order looks to the plain meaning, the legislative history and Ninth Circuit precedent.

Prior to the enactment of the Immigration and Nationality Act of 1952, United States law did not permit the automatic naturalization of a child born out of wedlock outside of the United States upon the naturalization of the mother. *See* Nationality Act of 1940, Section 314.

In enacting Section 321(a)(1), Congress intended a general rule to provide automatic citizenship to children born abroad of alien parents *only after* the naturalization of *both* biological parents.  Insisting on both being naturalized was deemed necessary to protect an unnaturalized parent from losing custody or other parental rights.  In an examination of Section 321(a), the Ninth Circuit held that Congress's rationale was the protection of parental rights. "If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished. . . .

7

United States District Court

For the Northern District of California

1    Thus, § 321(a) prevents the naturalizing parent from usurping the parental rights of the alien

2    parent." *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066 (9th Cir. 2003).

3         Nonetheless, recognizing that the general rule insisting on the naturalization of both

4    parents might be too restrictive, Congress expressly added three subparts establishing three

5    exceptions to the general rule.  All three involved circumstances where only *one* parent was

6    naturalized: (1) upon the naturalization of the surviving parent if one of the parents was

7    deceased, (2) upon the naturalization of the parent having legal custody of the child when there

8    was a legal separation of the parents and (3) upon the naturalization of the mother when the

9    child was born out of wedlock and the paternity of the father had not been established by

10   legitimation (the last being of concern in this case).  All three exceptions preserved any parental

11   rights of the non-naturalizing parent.

12        Our immediate concern is the phrase "paternity of the child is established by

13   legitimation."  A statute must be interpreted to give each word some operative effect.  *Walters*

14   *v. Metro. Educ. Enters.*, 519 U.S. 202, 209 (1997).  The word "by" indicates that legitimation

15   must be the means through which paternity was established.  Paternity established in some other

16   way was insufficient to defeat citizenship.  Put differently, if a father married the mother, then

17   the paternity was established by legitimation and such a father would have parental rights

18   Congress wished to preserve and leave unprejudiced, so automatic citizenship was denied in

19   that case.  But if paternity was established in some other way, automatic citizenship was

20   available.

21        A Senate report from 1950 discussing the same phrase (but in a different provision in the

22   Nationality Act of 1940) stated that "[a]s a general proposition, legitimation is accomplished by

23   the marriage of the parents with acknowledgment of paternity by the putative father."  Senate

24   Report No. 1515, at 692–93 (1950), *reprinted in* Oscar M. Trelles, II & James F. Bailey, III, 1

25   Immigration and Nationality Acts Legislative Histories and Related Documents, doc. 1

26   (1950–1978).  In employing the phrase "paternity of the child is established by legitimation,"

27   Congress intended that paternity of the born-out-of-wedlock child be established *by*

28   legitimation, which required the marriage of the parents subsequent to the child's birth.

United States District Court

For the Northern District of California

The final record is clear that petitioner's father never married his mother. This alone is sufficient to dispositively determine that petitioner qualified for derivative citizenship pursuant to Section 321(a).

Respondents argue for a different meaning. They submit that in 1983, El Savlador eliminated any distinction between children born out of wedlock and those born in wedlock and therefore all children in El Salvador were "legitimate" under the law, even retroactively. Where the legal distinctions between children born in wedlock and those born out of wedlock were removed, the only question under Section 321(a)(3) should be, respondents say, whether a child's paternity was established by any method at all (such as a written acknowledgment).

Respondents rely on court opinions that interpret the meaning of "legitimate" in the context of different statutes which have different purposes than Section 321(a). For example, in *Lau v. Kiley*, 563 F.2d 543 (2nd Cir. 1977), a United States citizen sought  pursuant to Section 203(a) of the INA to obtain a visa preference for his son born out of wedlock to a Chinese mother. Under that statute, visa preferences were available for legitimate children and for children who had been legitimated. The Second Circuit held that under Chinese law, all children were legitimate from birth. *Id.* at 551.

*Lau* is distinguishable because the visa-preference statute required only that the child in question be legitimated; it did *not* require that the child's paternity be established *by* legitimation. In the present action, petitioner's paternity was established merely by a written acknowledgment in 1978. Even if respondents are correct that all children were legitimated by the enactment of the 1983 Salvadoran constitution, petitioner's paternity was not established *by* the new law. Respondents' view gives short shrift to the statutory term "by." Respondents' view must be rejected in light of the plain meaning of the word "by" in the phrase "established by" and in light of the objective of the statute, as described above. This is dispositive.[1]

---

[1]  Moreover, although it is unnecessary to reach the point, this order holds that, unlike the laws at issue in *Lau*, the new Salvadoran constitution did not legitimate all children in El Salvador. El Salvador may have eliminated the distinction between illegitimate and legitimate children in 1983 but, as previously noted, nowhere in the new constitution did it assert that all children were "legitimate," much less that such constructive legitimation applied retroactively to children like petitioner who were born before the new constitution went into effect.

United States District Court

For the Northern District of California

*          *          *

The Board of Immigration Appeals has held that where all legal distinctions between children born in and out of wedlock were eliminated and all children accorded equal treatment under the laws, a child was deemed legitimate or legitimated for all purposes, including Section 321(a). *See, e.g., Matter of Rowe* 23 I&N Dec. 962, 965–66 (2006). This order is not bound by those BIA decisions because in deciding issues of nationality the Ninth Circuit has held that district courts are not required to defer to the BIA's interpretation of the citizenship laws. *Minasyan v. Gonzales*, 401 F.3d 1069, 1074 (9th Cir. 2005). Moreover, the BIA did not consider the distinction between whether a child was legitimated in general and whether a child's paternity was established *by* legitimation as required by Section 321(a).

The Court has considered as well whether a finding of citizenship would conflict with the wish of Congress to avoid cutting off any parental rights of the biological father. The 1983 Constitution in El Salvador spoke only in terms of the rights of children against their parents. It omitted any reference to parents' rights vis-a-vis their children. In 1994, that country's family code was amended and expanded the rights of the unwed father (whose rights were nonexistent before). Even with the 1994 change, however, the mother and father could agree on parental rights and only in the absence of an agreement was a judge required to decide. Here, it is abundantly clear that the unwed father acquiesced in an implicit agreement whereby petitioner's mother retained exclusive custody. The unwed father was a deadbeat dad in almost every way that mattered. By implicit agreement, all of the unwed father's parental rights were terminated. Therefore, when the mother was naturalized on September 15, 1995, there were no parental rights in the father, much less parental rights that might be disturbed by petitioner's naturalization.

This order additionally holds that petitioner's paternity was not established by legitimation under Texas law when petitioner stayed at his father's house during part of one semester of middle school. It is admittedly true that Texas amended its family code in 1989 to remove all distinctions between legitimate and illegitimate children. Nevertheless, this order finds that petitioner's father never asserted any claim to parental rights for purposes of Section

10

United States District Court

For the Northern District of California

321(a) prior to September 15, 1995.  During the time that petitioner stayed at his father's house in Texas, his mother continued to provide him with financial support and his father treated him like a stranger and never identified petitioner as his son to others.  These facts are not sufficient to establish paternity by legitimation for purposes of Section 321(a).[2]

Finally, the Court on its own initiative raised the issue of whether in 1995 before Section 321(a) was repealed there existed any requirement that naturalizing parents declare their minor children or complete any paperwork before the children could derive citizenship.  It is curious that a statute allowed anyone to automatically become a United States citizen with no paperwork, in contrast with the rigorous applications and screening that are usually required. Notwithstanding this peculiarity, there was no requirement under former statute or rule in effect in 1995 that petitioner complete any form or screening before he could derive citizenship from his mother.  The Ninth Circuit has plainly stated that "[b]ecause citizenship is transmitted automatically upon the parent's naturalization, it does not depend on the filing of an application, an administrative decision, a court order, an oath of allegiance, or any other procedure." *Minasyan v. Gonzales*, 401 F.3d 1069, 1075 (9th Cir. 2005) (holding that a petitioner had derived citizenship under Section 1432(a)(2) as of the date of his mother's naturalization where his parents were legally separated and his mother had assumed sole custody of him on a date prior to her naturalization).

**CONCLUSION**

For the foregoing reasons, petitioner is found to have become a United States citizen on September 15, 1995, upon the naturalization of his mother.  Sadly, he has committed crimes, serious ones, in the United States and ICE wants to send him back to El Salvador.  But once a citizen, always a citizen, and he has a right to remain in the United States and to be punished under our penal laws.  His request for a declaration that he is a United States citizen is **GRANTED**.

---

[2]  Any child support payments made by petitioner's father after September 1995 are irrelevant to the analysis of whether petitioner automatically derived citizenship upon his mother's naturalization.

11

1    The court of appeals stayed its proceedings and transferred this matter to the

2  undersigned only for the limited purpose of issuing a declaratory judgment on petitioner's

3  citizenship claim.  Since the undersigned is limited by this special proceeding to granting

4  declaratory relief, only the court of appeals is empowered to grant a release order.  The Clerk

5  shall forthwith certify the trial record, this order and the accompanying declaratory judgment to

6  the United States Court of Appeals for the Ninth Circuit for further proceedings.

7

8    **IT IS SO ORDERED.**

9

10  Dated: December 23, 2009.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California